HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| UNITED STATES OF AMERICA, | CASE NO. CR12-5085RBL |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| JERRAMEY LYNDELL ROPER, | |
| Defendant. | |

THIS MATTER is before the Court on successive motions by the defendant to suppress evidence prior to trial. The first motion is for evidentiary hearing regarding the voluntariness of defendant's Miranda waiver and statements to authorities [Dkt. #25]. The next motion is to suppress fruits of show-up identification [Dkt. #26]. Finally, defendant moves to suppress evidence seized during execution of search warrants [Dkt. #27]. The government has responded with a combined response to Motion to Suppress Identification and Statements of the Defendant [Dkt. #30]. The defendant has failed to respond to the third defense motion: To Suppress Evidence Seized During Execution of Search Warrants [Dkt. #27].

The government has relied totally on the police reports, the Miranda form (advisement of rights), the Tacoma Police Department "Field Show-Up Admonition," a handwritten statement

ORDER - 1

form, the crime laboratory report by the Washington State Patrol, and photographs of the scene of the shooting. Confronted with a mountain of evidence, defendant supports his motions with a tepid attempt to mount a fishing expedition for anything that can challenge the investigative record. The defendant does not even challenge the government's recitation of facts drawn directly from the record which the Court has reviewed.

## I. BACKGROUND

On May 20, 2011, Tacoma Police Officers responded to a 911 call at Katrina Ross' residence. (Exh. 1). She was at home with her children and boyfriend, Emmet Black. Ross heard the front door shut and she looked out the front window to see Black talking to the defendant, Jerramey Lyndell Roper. The defendant was next to the open passenger door of a black Lincoln car with tinted windows and shiny rims that was parked in front of the driveway. Ross knew the defendant as "Blue" and knew that he and Black frequented bars together. Ross described the defendant as a black male, approximately 30 years old, 5'5", stocky, and wearing a white t-shirt, blue jeans and latex gloves.

Ross noticed that the defendant was holding a black gun in his right hand, which was lowered to the ground. Ross described the gun as a small Uzi-type machine gun or possibly a 9mm handgun with an extended magazine. Ross immediately stepped outside to make the defendant aware of her presence. Black then began to approach her and the defendant pointed the gun in the air and fired one shot. Black looked at the defendant and he then fired two additional shots. The defendant then got into the back seat of the Lincoln and it drove off.

Black refused to talk to Ross about what happened and he took off in a car before the officers arrived. Black did not return to the scene that day to talk to officers. Ross was fully cooperative with law enforcement and expressed her dismay that a stray bullet could have easily

hit one of her children in the house. Another officer recovered three spent shell casings from the driveway.

An officer also spoke with two neighbors who lived nearby, Yesenia Acuchi and Eugenio Villegas-Beltran. (Exh. 2; Exh. 12). Acuchi reported that she was in her house when she heard three gunshots. (Exh. 12). She looked outside to see Black looking at an unknown black male who she described as 20 to 30 years old and was wearing a white t-shirt. The unknown male then got in a Lincoln car and drive off. Villegas-Beltran reported that he was outside, approximately 25 feet away, when he saw a black sedan pull up to his neighbor's house and an unknown black male began talking with Black. (Exh. 2). Villegas-Beltran then heard three shots and saw the unknown black male holding a short Uzi-type gun. Villegas-Beltran described the black male has having a medium build and wearing a white t-shirt and black pants. Acuchi and Villegas-Beltran both believed that they could identify the suspects involved in the shooting.

A responding officer knew the defendant went by the nickname "Blue," knew him to drive a black Lincoln matching the one involved, and knew him to reside at a certain residence. (Exhs. 3-4). Officers Patrick Patterson and Timothy Caber responded to the residence and at approximately 5:19 p.m., the black Lincoln approached the residence and the garage door opened. The officers attempted to initiate a traffic stop and the black Lincoln pulled into the driveway of the residence.

The officers exited the patrol car and followed felony-stop procedures, which included the display of firearms. Without prompting, the defendant exited the passenger seat, ignored the officers' commands, and began walking toward his house. He was now wearing a black t-shirt and jeans. He initially looked around as if he was contemplating whether to run but then sat down in the driveway and demanded to know what was going on. The defendant acted as if he

was "bored with the whole situation." The defendant was instructed not to move but he then grabbed his cell phone, opened the back side, and removed a memory chip which he tried to destroy with his teeth. The defendant eventually complied with commands, walked backwards toward the officers, and went to his knees, was detained without incident, and was placed in the back of the patrol car. Officers also detained the driver and only other passenger in the car, Shandra Gipson.

At 5:31 p.m., Officer Caper advised the defendant of his Miranda rights from a standard form. (Exhs. 3 at 4; Exh. 5). The defendant stated he understood his rights and was willing to talk and sign the form. The defendant asked what was going on and why he had been stopped. The officer explained that he had a few questions to ask and would then explain what was going on. The defendant appeared "contented with that answer."

The defendant told Officer Caper that he had been at Gipson's house when they decided to go to his grandmother's house. They visited his grandmother, Wanda Lewis, and his uncle, Lemmone Lewis, and then headed to the residence where they were stopped. The defendant denied living at this residence, claiming it was his "baby momma's" and he was there to check on it while she was out of town. The defendant denied any knowledge or involvement with a shooting.

Officer Shelbie Brown subsequently also contacted defendant in the back seat of the patrol car. (Exh. 6). The defendant confirmed that he had been advised of his Miranda rights. The officer asked if the defendant wanted to talk and he responded, "yes, can I ask you questions?" The officers told the defendant he could ask her anything. The defendant then responded by providing a second account of what happened that day.

This time the defendant told Officer Brown that he was having a "beef" over some bad drugs with a man he knew as "Money." Money called the defendant and began yelling about the drugs and making it right. The defendant then had Gipson drive him to Money's residence. The two began arguing and the defendant told Money that they should fight to set the deal straight. According to the defendant, Money then pulled out a "machine gun" and started shooting. The defendant then got back into the car and they fled the scene and drove straight to the house where they were stopped.

Gipson also agreed to speak with Officer Brown after she was advised of her Miranda rights. (Exh. 6 at 3-4; Exh. 10 at 11). She was extremely reluctant to talk stating repeatedly that the defendant would find her and kill her. Eventually, Gipson opened up and stated that on that day, the defendant was on the phone yelling and upset about "bad drugs." He then put on a white bulletproof vest, grabbed his "Uzi" and a shotgun, and told her to drive somewhere so he could "blow somebody's head off." Gipson first drove the defendant to his uncle's house where he retrieved white gloves. She then drove him to "Money's" residence. He and Money argued with each other and the defendant then pulled out the Uzi and started shooting in the air. He then jumped back in the car and told her to drive back to his uncle's house where he dropped off the guns, bulletproof vest, and gloves. They then drove back to the defendant's residence where they were stopped. Gipson also discussed with the officer the defendant's involvement with drug trafficking and the large quantities of cash, drugs, and firearms he had in his home.

Officer Robin Blackburn transported Ross to the defendant's residence and Officer Albert Malave did the same with Villegas-Beltran and Acuchi. All three were asked to see if they could identify either the defendant or Gipson. When Ross arrived, she first pointed out the defendant's Lincoln and stated that it was the car involved. The viewings of the defendant and

Gipson occurred at approximately 6:30 p.m. Prior to viewing either suspect, the witnesses each read a form with the following admonition:

> Show-Up: You are about to view a person(s) for the purpose of identifying a suspect in a criminal incident. The fact that this person(s) is shown to you should not influence your judgment. The person(s) may or may not have been involved in this criminal incident, therefore you should not guess. You are not obligated to identify anyone. Keep in mind that a person can change his or her appearance numerous ways. Finally, do not discuss this case with other witnesses nor indicate in any way that you have or have not identified anyone.

(Exhs. 7-9). Each witness signed the form acknowledging they understood the admonition.

For the viewings, the defendant and Gipson were separately pulled out of a patrol car and shown to the witnesses as they sat in their respective patrol cars. The witnesses were a couple of car lengths away for each viewing. No witness could identify Gipson. Ross identified the defendant as the shooter and specifically remarked, "I looked in his face when he was standing at the end of my driveway (facing me)." (Exh. 1 at 6; Exh. 7). Villegas-Beltran identified the defendant but thought he might be the driver since the shooter had been wearing a white t-shirt. (Exh. 2 at 2). Acuchi was not certain and could not identify the defendant. *Id*.

Officers Patterson and Caper transported the defendant to jail. During that drive, the defendant repeatedly told the same story that he had told Officer Brown. He talked about buying "bad dope" from "Money", about going to Money's house to get a refund, about Money pulling out a gun, and about Money firing the gun three times as the defendant fled the scene. (Exh. 3 at 5).

Officers subsequently obtained a number of search warrants, including for the defendant's residence, the black Lincoln and Lemmone Lewis' residence. Recovered from the defendant's residence were an SKS assault rifle, large quantities of ammunition in various calibers, 307.8 grams of crack cocaine, and $3,385. (Exh. 10 at 11-12). No evidence related to the shooting was

recovered from the black Lincoln. In Lemmone's detached garage was a ballistic vest and a box for an Uzi pistol.

Officers spoke with defendant's uncle (Lemmone) and grandmother (Wanda) and both were cooperative. (Exh. 3 at 6-7; Exh. 11 at 5). Lemmone confirmed that the defendant had stopped by earlier that day before leaving and then coming back five or ten minutes later. Wanda also confirmed that she had seen the defendant earlier that day at Lemmone's residence. She stated, "I saw Blue as he was walking to his car from the house and he looked mad, he's a hothead. He got into the car and left." She denied the defendant's claim that he lived with her and confirmed that he went by the name "Blue."

Two months later, Lemmone called law enforcement to report a discovery in his garage. (Exh. 13). He reported that he found a green bag hidden in his garage that must have been missed when the search warrant was executed. Inside that bag were a loaded IMI Uzi .45 caliber semi-automatic pistol and a loaded Remington 870 Magnum 12 gauge slide-action shotgun. The Uzi pistol was subsequently sent to the state crime lab and a forensic scientist confirmed that this gun fired the three spent shell casings left at the scene of the shooting on May 20. (Exh. 14).

## II. ANALYSIS

**A. Voluntariness of Defendant's Miranda Waiver and Statements to the Authorities.**

When the government seeks to offer statements made by an individual subject to custodial interrogation, it must establish by a preponderance of the evidence that the individual knowingly and voluntarily waived his Miranda rights. *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). A waiver is "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. A waiver is "knowing" if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision

to abandon it." *Id*. A waiver's validity is assessed based on the "totality of the circumstances surrounding the interrogation." *Id*.

The evidence that has been presented thus far is that the police have executed a textbook process of advising the defendant of his Miranda warnings, had the defendant sign the Miranda waiver form, and that the defendant freely gave statements that were quickly concocted to meet his purposes.

No coercive police activity was either preceded or accompanied by the defendant's statements. No evidence is offered to challenge the voluntariness of the waiver or the statements that follow. The defendant simply wants an opportunity for a "dry run" of the government's evidence. The motion is **DENIED**.

**B. The Show-Up Identification of the Defendant is Reliable and Not a Product of Unduly Suggestive Procedures.**

Identifications of a defendant are inadmissible only if the result of a procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998). Challenges to a pretrial identification procedure are two pronged: A court must first determine whether the procedure was "impermissibly suggestive." *See United States v. Bagley*, 772 F.2d 42, 492 (9th Cir. 1985). But even if a pretrial procedure is impermissibly suggestive, under the totality of the circumstances, if the identification is sufficiently reliable and may properly be allowed into evidence. *Montgomery*, 150 F.3d at 993. Illustrative factors to include as part of reliability tests include: (1) the witness' opportunity to review the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *Id*.

Given the admonition delivered to each eyewitness and the proximity and the focused attention of the witnesses on the defendant at the time the crime was committed, the "one-on-one show-up" was a legitimate identification procedure. *Bagley*, at 493. All three witnesses received a strongly worded caution before the show-up to ensure the accuracy of any identification. The identifications occurred less than two hours after the shooting, while the incident and the suspects were still fresh in the witnesses' minds. Two of the witnesses clearly identified the defendant. Acuchi was unable to identify the defendant and all three witnesses were unable to identify Shandra Gipson as the driver of the Lincoln. Here the witnesses were unable to make certain identifications and this confirms in itself that show-up was not overly suggestive. The Motion to Suppress the Identification of the Defendant is **DENIED**.

**C. Search Warrants Were Authorized for Probable Cause.**

The government must respond to defendant's motion regarding search warrants by the close of business July 30, 2012. The Court will resolve the motion without an evidentiary hearing. The evidentiary hearing scheduled for August 3, 2012 is **STRICKEN**.

**IT IS SO ORDERED.**

Dated this 26th day of July, 2012.

Ronald B. Leighton
United States District Judge